# AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Ryan S. Burke, depose and state as follows:

## AGENT BACKGROUND

1. I am a Special Agent of the Federal Bureau of Investigation ("FBI") and have been so employed since October 2012. I am currently assigned to the FBI's New Hampshire Resident Agency where I am tasked with investigating violent criminals and major offenders throughout the state. I primarily work alongside the Manchester Police Department ("MPD") as part of an initiative focused on reducing gun violence and other crime in the city of Manchester.

2. Throughout my career, I have led and/or been involved with investigations of robberies, kidnappings, murders, fugitives, extortions, threats, drug distribution, illegal possession of firearms, and other crimes. My investigations have included the use of the following investigative techniques: physical surveillance; handling of cooperating sources and witnesses; exploitation of cellular, social media, and Internet Protocol ("IP") based communications data; execution of search and seizure warrants; wire, electronic, and oral wiretaps; and the execution of arrest warrants.

3. Based on my training, experience, and information provided to me by other law enforcement officers, I am familiar with the modus operandi used by individuals engaged in the violation of various criminal offenses, such as those related to acts of violence, firearms, and controlled substances. For example, I have handled many cooperating sources and witnesses who have provided information to me specifically related to shootings, the distribution of controlled substances, and various firearms offenses. I have also reviewed thousands of court-authorized wiretap intercepts between drug traffickers, violators of firearm offenses, individuals conspiring to commit armed robberies, and individuals engaged in the violation of other offenses. Many of

these investigations have resulted in the execution of search warrants, arrest warrants, and eventual convictions.

## PURPOSE OF AFFIDAVIT

4. I submit this affidavit in support of an application for a warrant to search the following electronic devices (collectively, the "**Target Devices**"), which are currently secured at MPD:

   a. Apple iPhone seized by law enforcement in Manchester, NH on June 25, 2021 from a black backpack located inside a Subaru Legacy (hereafter, "**Target Device 1**");

   b. Apple iPhone seized by law enforcement in Manchester, NH on June 25, 2021 from the front passenger area of a Subaru Legacy (hereafter, "**Target Device 2**");

   c. Cellular phone seized by law enforcement in Manchester, NH on August 5, 2021 from the front passenger seat of an Audi A4 (hereafter, "**Target Device 3**");

   d. Blue Motorola cellular phone seized by law enforcement in Loudon, NH on August 19, 2021 from Erin Conroy (hereafter, "**Target Device 4**").

5. Based on the information contained herein, there is probable cause to believe that the **Target Devices** contain evidence, fruits, and instrumentalities of the crimes of 18 U.S.C. § 922(g)(1) [Felon in Possession of Ammunition & Firearm], 18 U.S.C. § 924(c) [Possession of a Firearm in Furtherance of a Drug Trafficking Offense], 21 U.S.C. § 841 [Distribution of Controlled Substances], 21 U.S.C. § 846 [Conspiracy to Distribute Controlled Substances], and 18 U.S.C. § 521 [Criminal Street Gangs].

6. The information set forth in this affidavit is based on my personal participation in this investigation, as well as my training and experience, and information received from other law enforcement officers. I have not set forth every detail I or other law enforcement officers know

about this investigation but have set forth facts that I believe are sufficient to evaluate probable cause as it relates to the issuance of the requested warrant.

## PROBABLE CAUSE

7.      On June 13, 2021, MPD conducted a motor vehicle stop of a white Subaru Legacy driven by Erin Conroy (YOB: 1989) with Ethan Lea (YOB: 1990), the only other occupant, in the front passenger seat. As a result of the motor vehicle stop, the Subaru Legacy was seized pending application for a search warrant which was ultimately granted. The search of the vehicle resulted in the seizure of approximately 284.5 grams of a substance which field-tested positive for methamphetamine, 85.9 grams of a substance believed to be heroin/fentanyl, 7.5 grams of a substance which field-tested positive for crack cocaine, a digital scale commonly used by drug traffickers, and **Target Device 1** – all of which was located in a black backpack in the front passenger seat area where Lea had been seated. Additionally, **Target Device 2** was also located and seized from the front passenger seat area where Lea had been seated. Consequently, a warrant was issued for Lea's arrest for Controlled Drug Violations [RSA 318-B:2].

8.      On July 30, 2021, MPD conducted a motor vehicle stop of a black Audi A4 which was driven by Lea with no other occupants. He was arrested pursuant to the outstanding warrant detailed above. As a result of the motor vehicle stop, the Audi A4 was seized pending application for a search warrant, which was ultimately granted. The search of the vehicle resulted in the seizure of approximately $2,408 in US currency, approximately 464.7 grams of a substance which field-tested positive for methamphetamine, two digital scales commonly used by drug traffickers, and **Target Device 3**. Consequently, another warrant was issued for Lea's arrest for Controlled Drug Violations [RSA 318-B:2] following his release on personal recognizance for the initial warrant.

9. On August 19, 2021, law enforcement surreptitiously observed Lea and Conroy enter Room 229 of the Quality Inn in Loudon, NH. While standing outside of the room, law enforcement called **Target Device 4** and it was answered by Lea. He was then informed of his active arrest warrant related to the second motor vehicle stop and he was asked to exit the room. Lea eventually terminated the call and exited the room without any possessions besides currency. He was placed under arrest. Law enforcement then knocked on the hotel room door and asked Conroy if she would exit. She exited the room with **Target Device 4** in her hand and was placed under arrest pursuant to a warrant related to the first motor vehicle stop. **Target Device 4** was seized pending this application for a search warrant.

10. Lea was subsequently transported to MPD for processing and to be interviewed. Prior to the interview, Lea was informed of his Miranda rights, acknowledged his understanding of those rights, and signed a form to memorialize his willingness to answer questions without an attorney present. In the audio-video recorded interview that followed, Lea provided, amongst other things, information related to his use of cellular phones in furtherance of his and his confederates' illegal possession of firearms and distribution of controlled substances.

11. Lea stated the controlled substances from the first motor vehicle stop were personally provided to him by a member of the Gangster Disciples named Ryan Call (YOB: 1986). Lea had met Call while in prison together and maintained a personal relationship with him. Prior to the first motor vehicle stop, Call informed Lea that the controlled substances originated from Call's close associate and fellow Gangster Disciples member Michael Francis (YOB: 1987).

12. In early July 2021, Call was arrested in Manchester and remains incarcerated as of the writing of this affidavit. Following Call's arrest, Lea was contacted by Francis who informed Lea that he would now be supplying controlled substances to him in Call's absence. Consequently,

4

the controlled substances from the second motor vehicle stop were personally provided to Lea by Francis.

13. Lea stated he received controlled substances from Francis on a daily basis. On average, Lea stated he would receive approximately one pound of methamphetamine ($6,600 - $6,800 per pound), a couple ounces of cocaine ($1,400 per ounce), and a half-pound of heroin/fentanyl ($5,000 per 500 grams) each day from Francis. Lea would pay Francis in cash or via Cash App – accessed via Lea's cellular phone(s) – for the controlled substances he received from Francis. Lea would subsequently distribute the controlled substances to customers located in and between Manchester and Meredith and sometimes all the way up to Berlin NH.

14. As a result of the seizures of controlled substances from the two motor vehicle stops, Lea estimated he owed Francis approximately $20,000. Francis informed Lea at one point that he was willing to decrease his debt if Lea were able to provide Francis with firearms. Additionally, Lea acknowledged he previously provided Call with a shotgun and helped facilitate a transaction wherein Call received two rifles and ammunition. Based on a review of the criminal histories for Lea, Call, and Francis, I know they have each been convicted of a crime(s) punishable by imprisonment for a term exceeding one year. Therefore, Lea, Call, and Francis are federally prohibited from possessing firearms.

15. Lea stated that he and Conroy, whom he considered his girlfriend, would at times share a cellular phone. He also acknowledged using multiple cellular phones since his release from prison in April 2021 – some or all of which have been seized by law enforcement on various occasions. Lea stated specifically that he, not Conroy, recently used **Target Device 4** to communicate with Francis to facilitate controlled substances transactions. Lea also stated that he routinely used cellular phones – including and/or similar to the **Target Devices** – to facilitate the

acquisition and sale of controlled substances and firearms throughout the District of New Hampshire. Lea provided passcodes to law enforcement which he stated would likely unlock all of the **Target Devices**.

16. Based upon my training, knowledge, and experience, I know that cellular telephones such as the **Target Devices** are capable of storing information including, but not limited to, text and audio communications, call history, contact information, calendar entries, downloads, applications, videos, photographs, and electronic documentation in the cellular telephone's memory. In addition, I know that a forensic examination of a cellular telephone and these other devices can result in the retrieval of such data which has been stored on them, even after the passage of time, because files that have been hidden or deleted can still be recovered.

17. Based upon training, knowledge, and experience as well as from information obtained from other law enforcement officers, I know that it is common practice for individuals engaged in the possession and trafficking of drugs, weapons, and ammunition, such as Lea, to routinely:

    a. Utilize cell phones, text messaging apps, social media, and coded communications to interact with and do business with their customers, suppliers, confederates, and couriers;

    b. Utilize multiple cell phones to evade law enforcement detection; and

    c. Utilize firearms in furtherance of their illegal activities.

18. Therefore, I know that evidence of crimes involving drugs, weapons, and ammunition can be found in electronic media such as cell phones. Such evidence includes, but is not limited to:

    a. Names, addresses, telephone numbers, usernames, and email addresses of co-conspirators;

    b. Messages/emails sent to or received from co-conspirators or other entities necessary for conducting illegal activity such as arranging travel and transportation;

    c. Photographs/videos of themselves and co-conspirators;

    d. Photographs/videos of contraband and proceeds of illegal activity;

    e. Records of social media and app usage in furtherance of illegal activity;

    f. Records of internet activity in furtherance of illegal activity;

    g. Calendar entries and to-do lists; and

    h. Financial information and bank accounts used in furtherance of illegal activity.

19. For the aforementioned reasons, I believe Lea conspired with criminal street gang members to illegally possess and distribute various controlled substances, firearms, and ammunition. I also believe based on my training, experience, and his own admissions, that he utilized the **Target Devices** to facilitate this criminal activity. Therefore, probable cause exists that evidence of this activity is contained on the **Target Devices**.

## FACTS ABOUT CELLULAR PHONES

20. The **Target Devices** are currently in the lawful possession of MPD, in secure evidence storage at MPD, 405 Valley Street, Manchester, NH 03103. They came into MPD's custody in the following way: **Target Device 1** and **Target Device 2** were seized during the search of the Subaru Legacy conducted pursuant to an authorized search warrant in connection with Lea's June 13, 2021 motor vehicle stop; **Target Device 3** was seized during the search of the Audi A4 conducted pursuant to an authorized search warrant in connection with Lea's July 30, 2021 motor

vehicle stop; **Target Device 4** was seized from Erin Conroy incident to the arrest of Conroy and Lea described above and conducted on August 19, 2021. Therefore, while law enforcement might already have all necessary authority to examine the **Target Devices**, I seek this additional warrant out of an abundance of caution to be certain that an examination of the **Target Devices** will comply with the Fourth Amendment and other applicable laws.

21. Based on my training and experience and the training and experience of law enforcement personnel who routinely handle this type of equipment, I understand that the **Target Devices** have been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when they first came into law enforcement's possession.

22. Based on my training and experience, I use the following technical terms to convey the following meanings:

    a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing

back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.      Digital camera:   A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.   Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.   Removable storage media include various types of flash memory cards or miniature hard drives.   Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c.      Portable media player:   A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.   However, a portable media player can also store other digital data.   Some portable media players can use removable storage media.   Removable storage media include various types of flash memory cards or miniature hard drives.   This removable storage media can also store any digital data.   Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

9

d.      GPS:   A GPS navigation device uses the Global Positioning System to display its current location.   It often contains records the locations where it has been.   Some GPS navigation devices can give a user driving or walking directions to another location.   These devices can contain records of the addresses or locations involved in such navigation.   The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth.   Each satellite contains an extremely accurate clock.   Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.   These signals are sent by radio, using specifications that are publicly available.   A GPS antenna on Earth can receive those signals.   When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.      PDA:   A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs.   Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.   PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives.   This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as

personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f.     Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

23.    I also know that many smartphones like the **Target Devices** (which are included in Attachment B's definition of "computer hardware") can now function essentially as small computers. Smartphones such as the **Target Devices** have capabilities that include serving as a wireless telephone, digital camera, portable media player, GPS navigation device, sending and receiving text messages and e-mails, and storing a vast range and amount of electronic data. Examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device. Based on my training, experience, and information provided to me by other law enforcement personnel, I am aware that individuals commonly store records of the type described in Attachment B in mobile phones, computer hardware, computer software, and storage media.

**ELECTRONIC STORAGE AND FORENSIC ANALYSIS**

24.    Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

25.     *Forensic evidence.*   As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when.   There is probable cause to believe that this forensic electronic evidence might be on the Device because:

  a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file

  b. Forensic evidence on a device can also indicate who has used or controlled the device.   This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

  c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

  d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process.   Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.   Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer

behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

26. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

27. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

28. Based on the information described above, I believe Lea, Call, Francis, and others yet unknown worked together to distribute controlled substances within the District of New Hampshire. Additionally, I believe Lea, Call, and/or Francis – all prohibited from possessing firearms – worked together to illegally obtain firearms and ammunition within the District of New Hampshire. Based on the information contained herein, I believe the **Target Devices** will likely contain evidence of those violations and will also evidence the affiliation of Lea, Call, Francis, and others yet unknown with the Gangster Disciples criminal street gang.

29. Therefore, I have probable cause to believe that evidence, fruits, and instrumentalities of the crimes of 18 U.S.C. § 922(g)(1) [Felon in Possession of Ammunition & Firearm], 18 U.S.C. § 924(c) [Possession of a Firearm in Furtherance of a Drug Trafficking Offense], 21 U.S.C. § 841 [Distribution of Controlled Substances], 21 U.S.C. § 846 [Conspiracy to Distribute Controlled Substances], and 18 U.S.C. § 521 [Criminal Street Gangs], as further described in Attachment B, are contained within the equipment described in Attachment A.

/s/ Ryan S. Burke
Ryan S. Burke, Special Agent
Federal Bureau of Investigation

The affiant appeared before me by telephonic conference on this date pursuant to Fed. R. Crim. P. 4.1 and affirmed under oath the content of this affidavit and application.

Date: Sep 8, 2021
Time: 12:02 PM, Sep 8, 2021

HONORABLE ANDREA K. JOHNSTONE
UNITED STATES MAGISTRATE JUDGE

# ATTACHMENT A

*Description of Equipment to Be Searched*

The equipment to be searched consists of the following (hereafter, the "**Target Devices**"):

a. Apple iPhone seized by law enforcement in Manchester, NH on June 25, 2021 from a black backpack located inside a Subaru Legacy (hereafter, "**Target Device 1**");

b. Apple iPhone seized by law enforcement in Manchester, NH on June 25, 2021 from the front passenger area of a Subaru Legacy (hereafter, "**Target Device 2**");

c. Cellular phone seized by law enforcement in Manchester, NH on August 5, 2021 from the front passenger seat of an Audi A4 (hereafter, "**Target Device 3**");

d. Blue Motorola cellular phone seized by law enforcement in Loudon, NH on August 19, 2021 from Erin Conroy (hereafter, "**Target Device 4**").

The **Target Devices** are currently secured at the Manchester Police Department in Manchester, NH.

## ATTACHMENT B

### *Description of Information or Items to Be Seized*

I.  All records, in whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of 18 U.S.C. § 922(g)(1) [Felon in Possession of Ammunition & Firearm], 18 U.S.C. § 924(c) [Possession of a Firearm in Furtherance of a Drug Trafficking Offense], 21 U.S.C. § 841 [Distribution of Controlled Substances], 21 U.S.C. § 846 [Conspiracy to Distribute Controlled Substances], and 18 U.S.C. § 521 [Criminal Street Gangs], including those related to:

A.  Evidence of who used, owned, or controlled the equipment;

B.  Evidence of the user's past and current whereabouts;

C.  The identities and aliases of individuals whom participated in the violations listed above;

D.  The locations where evidence or other items related to the violations listed above was obtained, is stored, or has been discarded;

E.  The methods of communication between individuals engaged in the violations listed above, including the telephone numbers, messaging applications, and social media accounts used by the individuals;

F.  The substance of communications regarding the planning, execution, transactions, and/or discussions of the violations listed above;

G.  The substance of communications regarding the acquisition, disposal, and/or discussion of items involved in the violations listed above;

H.  The substance of communications regarding controlled substances, firearms, ammunition, and criminal street gang affiliation;

I.  The substance of communications regarding money, vehicles, communications devices, or other items acquired during or for activity that would result in the violations listed above;

J.  Photographs of items or information related to the violations listed above;

K.  The relationship between the users of the Target Devices and other co-conspirators;

L.  The identity, location, and travel of any co-conspirators, as well as any co-conspirators' acts taken in furtherance of the violations listed above;

    M.    Evidence of malicious computer software that would allow others to control the equipment, software, or storage media, evidence of the lack of such malicious software, and evidence of the presence or absence of security software designed to detect malicious software;

    N.    Evidence of the attachment of other hardware or storage media;

    O.    Evidence of counter-forensic programs and associated data that are designed to eliminate data;

    P.    Evidence of the times the equipment was used;

    Q.    Passwords, encryption keys, and other access devices that may be necessary to access the equipment;

    R.    Records relating to accounts held with companies providing Internet access or remote storage of either data or storage media; and

    S.    Records relating to the ownership, occupancy, or use of the location from which the equipment was obtained by law enforcement investigators.

    T.    Lists of customers and related identifying information;

    U.    Types, amounts, and prices of drugs and guns trafficked as well as dates, places, and amounts of specific transactions;

    V.    Any information related to sources of drugs and guns (including names, addresses, phone numbers, or any other identifying information);

    W.    Any information recording the users' schedule or travel from April 1, 2021 to the present;

    X.    All bank records, checks, credit card bills, account information, and other financial records.

II.    Serial numbers and any electronic identifiers that serve to identify the equipment.

### DEFINITIONS

For the purpose of this warrant:

    A.    "Equipment" means any hardware, software, storage media, and data.

    B.    "Hardware" means any electronic device capable of data processing (such as a computer, digital camera, cellular telephone or smartphone, wireless communication device, or GPS navigation device); any peripheral input/output device (such as a keyboard, printer, scanner, monitor, and drive intended for removable storage media); any related communication device (such as a router,

        wireless card, modem, cable, and any connections), and any security device, (such as electronic data security hardware and physical locks and keys).

C.     "Software" means any program, program code, information or data stored in any form (such as an operating system, application, utility, communication and data security software; a log, history or backup file; an encryption code; a user name; or a password), whether stored deliberately, inadvertently, or automatically.

D.     "Storage media" means any media capable of collecting, storing, retrieving, or transmitting data (such as a hard drive, CD, DVD, USB or thumb drive, or memory card).

E.     "Data" means all information stored on storage media of any form in any storage format and for any purpose.

F.     "A record" is any communication, representation, information or data. A "record" may be comprised of letters, numbers, pictures, sounds or symbols.

### *Return of Seized Equipment*

If, after inspecting seized equipment, the government determines that the equipment does not contain contraband or the passwords, account information, or personally-identifying information of victims, and the original is no longer necessary to preserve as evidence, fruits or instrumentalities of a crime, the equipment will be returned within a reasonable time, if the party seeking return will stipulate to a forensic copy's authenticity and accuracy (but not necessarily relevance or admissibility) for evidentiary purposes.

If equipment cannot be returned, agents will make available to the equipment's owner, within a reasonable time period after the execution of the warrant, copies of files that do not contain or constitute contraband; passwords, account information, personally-identifying information of victims; or the fruits or instrumentalities of crime.